---

**Fill in this information to identify the case:**

United States Bankruptcy Court for the

Southern _____ District of New York _____
                        (State)

Case number (if known) _____ Chapter 15

☐ Check if this is an
amended filing

---

Official Form 401

# Chapter 15 Petition for Recognition of a Foreign Proceeding    12/15

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write debtor's name and case number (if known).

| | | |
|---|---|---|
| 1. | Debtor's name | Niton Fund SPC |

| | | |
|---|---|---|
| 2 | Debtor's unique identifier | **For non-individual debtors:** |

☐ Federal Employer Identification Number (EIN) ___ ___ – ___ ___ ___ ___ ___ ___ ___

☑ Other Cayman Company _____ Describe identifier _____

**For individual debtors:**

☐ Social Security number xxx – xx– ___ ___ ___ ___

☐ Individual Taxpayer Identification number (ITIN) 9 xx – xx – ___ ___ ___ ___

☐ Other _____ Describe identifier _____

| | | |
|---|---|---|
| 3. | Name of foreign representative(s) | Matthew James Wright, Christopher Barnett Kennedy |

| | | |
|---|---|---|
| 4. | Foreign proceeding in which appointment of the foreign representative(s) occurred | FSD 0117/2015 (Grand Court Cayman Islands) |

| | | |
|---|---|---|
| 5 | Nature of the foreign proceeding | *Check one* |

☑ Foreign main proceeding
☐ Foreign nonmain proceeding
☐ Foreign main proceeding, or in the alternative foreign nonmain proceeding

| | | |
|---|---|---|
| 6. | Evidence of the foreign proceeding | ☑ A certified copy, translated into English, of the decision commencing the foreign proceeding and appointing the foreign representative is attached |

☐ A certificate, translated into English, from the foreign court, affirming the existence of the foreign proceeding and of the appointment of the foreign representative, is attached

☐ Other evidence of the existence of the foreign proceeding and of the appointment of the foreign representative is described below, and relevant documentation, translated into English, is attached
_____
_____

| | | |
|---|---|---|
| 7. | Is this the only foreign proceeding with respect to the debtor known to the foreign representative(s)? | ☐ No. (Attach a statement identifying each country in which a foreign proceeding by, regarding, or against the debtor is pending.) |
| | | ☑ Yes |

Debtor _____    Case number _____
         *Name*

8. **Others entitled to notice**    Attach a list containing the names and addresses of

(i)    all persons or bodies authorized to administer foreign proceedings of the debtor,

(ii)   all parties to litigation pending in the United States in which the debtor is a party at the time of filing of this
       petition, and

(iii)  all entities against whom provisional relief is being sought under § 1519 of the Bankruptcy Code

9. **Addresses**

Country where the debtor has the center of its main interests:

Cayman Islands

Debtor's registered office:    R&H Trust Co., Ltd.

West Bay Road
_____
Number        Street

897, Windward 1, Regatta Office Park
_____
P.O. Box

                                    KY1-1103
_____
City          State/Province/Region    ZIP/Postal Code

Grand Cayman, Cayman Islands
_____
Country

Individual debtor's habitual residence:

_____
Number        Street

_____
P.O. Box

_____
City          State/Province/Region    ZIP/Postal Code

_____
Country

Address of foreign representative(s):

_____
Number        Street

_____
P.O. Box

_____
City          State/Province/Region    ZIP/Postal Code

_____
Country

10. **Debtor's website (URL)**    _____

11. **Type of debtor**    *Check one:*

☐ Non-individual (*check one*):

☐ Corporation. Attach a corporate ownership statement containing the information
   described in Fed. R. Bankr. P. 7007.1.

☐ Partnership

☐ Other. Specify _____

☐ Individual

Debtor _____    Case number _____

**12  Why is venue proper in *this district*?**

Check one

☑ Debtor's principal place of business or principal assets in the United States are in this district

☐ Debtor does not have a place of business or assets in the United States but the following action or proceeding in a federal or state court is pending against the debtor in this district
_____

☐ If neither box is checked, venue is consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative, because
Evidence in district

**13  Signature of foreign representative(s)**

I request relief in accordance with chapter 15 of title 11, United States Code

I am the foreign representative of a debtor in a foreign proceeding, the debtor is eligible for the relief sought in this petition, and I am authorized to file this petition

I have examined the information in this petition and have a reasonable belief that the information is true and correct

I declare under penalty of perjury that the foregoing is true and correct

X _____    MATTHEW JAMES WRIGHT
Signature of foreign representative        Printed name

Executed on  12 / 07 / 2015
MM / DD / YYYY

X _____    _____
Signature of foreign representative        Printed name

Executed on  __ / __ / ____
MM / DD / YYYY

**14  Signature of attorney**

X _____    Date  12 / 07 / 2015
Signature of Attorney for foreign representative    MM / DD / YYYY

Warren Gluck
Printed name

Holland & Knight LLP
Firm name

31        W 52nd St
Number        Street

New York                    NY        10019
City                        State      ZIP Code

212-513-3396                warren.gluck@hklaw.com
Contact phone                Email address

4701421                    NY
Bar number                State

Warren E. Gluck, Esq.
Barbra R. Parlin, Esq.
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, NY 10019
Phone: 212-513-3200
Fax: 212-385-9010
warren.gluck@hklaw.com
barbra.parlin@hklaw.com

*Counsel for the Petitioners*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                          :

In re:                    :

NITON FUND SPC,      :
                          :

        Debtor in a     :
        Foreign Proceeding.  :
                          :
------------------------------------------------------x

Chapter 15

Case No. 15-_____ (___)

## VERIFIED PETITION FOR RECOGNITION OF FOREIGN INSOLVENCY PROCEEDING AND APPLICATION FOR ADDITIONAL RELIEF PURSUANT TO SECTIONS 1504, 1507, 1509, 1515, 1517, 1520 AND 1521 OF THE BANKRUPTCY CODE

Matthew James Wright and Christopher Barnett Kennedy, duly appointed joint official liquidators and foreign representatives ("**Petitioners**" or "**Liquidators**") of Niton Fund SPC ("**Niton**") for and on behalf of the Short Term Shipping Fund Segregated Portfolio (the "**Short Term Fund**"), a company in liquidation under the supervision of the Grand Court of the Cayman Islands, Financial Services Division (the "**Cayman Court**"), case no. FSD 0117/2015 (NRLC) (the "**Cayman Liquidation**"), pursuant to section 124 of the Cayman Islands Companies Law (2013 Revision) (the "**Cayman Companies Law**")[1] by its undersigned United States counsel, Holland & Knight LLP,

---

[1] Excepts of the relevant provisions of the Cayman Companies Law are attached as Exhibit 1 to the Leontsinis Declaration

respectfully submits the Official Form Petition, this Verified Petition (together, the **"Petition"**), the accompanying Declaration of Matthew James Wright executed on December 1, 2015 (the **"Wright Declaration"**), the Declaration of Stephen Leontsinis, executed on November 16, 2015 (the **"Leontsinis Declaration"**), and the Declaration of Warren E. Gluck, executed on December 7, 2015 (the **"Gluck Declaration"**), for entry of an Order pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the **"Bankruptcy Code"**):

(i)      recognizing the Cayman Liquidation as a foreign main proceeding, or in the alternative, a foreign non-main proceeding, pursuant to chapter 15 of the Bankruptcy Code, and Petitioners as Niton's foreign representatives under sections 1509 and 1517 of the Bankruptcy Code;

(ii)      granting automatic relief pursuant to section 1520 of the Bankruptcy Code;

(iii)      granting other and additional relief pursuant to sections 1507 and 1521(a) and (b) of the Bankruptcy Code, including authorizing Petitioners to examine witnesses, take evidence and seek the production of documents concerning the assets, affairs, rights obligations or liabilities of Niton by:

(a)      issuing discovery requests to intermediary banks located in the Southern District of New York (the **"District"**) that process U.S. dollar-denominated wire transfers and maintain records of such transfers with respect to the Discovery Subjects (defined below) so as to ascertain information concerning Niton's assets prior to the commencement of the Cayman Liquidation and critical information concerning Niton's claims against third parties (as set forth in detail below and in the accompanying Wright and Leontsinis Declarations);

(b)      entry of an order that, upon service by Petitioners through their U.S. counsel, Holland & Knight, LLP, enjoins all persons and entities subject to the jurisdiction of this Court from destroying, secreting, altering, deleting or otherwise disposing of any documents, records, filings, or other information, however stored, concerning or relating to the affairs of Niton;

(c)      granting the Petitioners authority to assert claims of Niton against parties that are subject to the jurisdiction of courts in the United States;

(d)      ordering that the administration or realization of any assets of Niton within the territorial jurisdiction of the United States be entrusted to the Petitioners as the exclusive representatives of Niton in the United States; and

(e)      granting such other and further relief as the Court may deem just and proper.

## PRELIMINARY STATEMENT

1.      This Court previously has noted that "[u]nique to the Bankruptcy Code," chapter 15 contains a statement of purpose, which is: "to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency . . . ." *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 126 (Bankr. S.D.N.Y. 2007) (quoting 11 U.S.C. § 1501), *aff'd*, 389 B.R. 325, 339 (S.D.N.Y. 2008). Among the express objectives of chapter 15 is to promote the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor[.]" 11 U.S.C. § 1501(a)(3).

2.      The Liquidators request recognition of the Cayman Liquidation as a foreign main proceeding primarily to obtain this Court's assistance in obtaining critical discovery from entities subject to the jurisdiction of this Court.  The Liquidators principally seek discovery of records from banks that concern Niton transactions and claims arising from those transactions.  Niton, its Special Purpose Vehicles (SPVs), as well Niton's counterparties/potential defendants principally transacted business in U.S. dollars, which transactions cleared through intermediary or correspondent banks located in this District.  These banks maintain the records of these wire transfer transactions, and those records are essential for the Liquidators to gain a better understanding of how Niton's assets and funds were transferred prior to the commencement of the Cayman Liquidation, and to investigate claims of Niton against any third parties. Gluck Declaration ¶¶ 3, 21; Wright Declaration, ¶¶ 74-75.

3.      As this Petition, the accompanying declarations and the exhibits thereto demonstrate, the Cayman Liquidation should be recognized as a foreign main proceeding.  In the event that the Cayman Liquidation is recognized as a foreign nonmain proceeding, this Court has the discretion to

order whatever protections and relief it deems appropriate pursuant to sections 1507 and 1521 of the Bankruptcy Code - including the requested discovery relief.

4.    The Liquidators seek precisely the type of relief that chapter 15 was designed to provide, and the Cayman Liquidation and this Petition meet all the requirements for recognition and the requested relief. In particular, the Liquidators were appointed by the Cayman Court to administer Niton's assets, liabilities, and any ongoing business occurring in connection with the court-ordered Cayman Liquidation of Niton pursuant to the Cayman Companies Law, a law relating to insolvency or adjustment of debt. Wright Declaration, ¶ 46.

5.    Likewise, the Cayman Liquidation is a collective judicial proceeding as referenced in 15 U.S.C. § 101(23), subject to the oversight and control of the Cayman Court, encompassing all creditors and stakeholders of Niton, which is pending in the Cayman Islands, the country in which Niton was formed, maintained its registered office, maintains its center of main interests ("**COMI**"), and where the Liquidators are engaged in substantial, non-transient economic activity associated with the wind-down and liquidation of Niton's business and affairs. Wright Declaration, ¶¶ 49-52.

6.    Pursuant to section 1516(c) of the Bankruptcy Code, the Cayman Islands are presumed to be Niton's COMI because Niton was incorporated there and maintains its registered office there. Wright Declaration, ¶ 50. This Petition and the accompanying declarations further demonstrate that Niton's counterparties and creditors had clear and actual knowledge that Niton was a Cayman Islands entity. Wright Declaration, ¶ 53. Since the commencement of the Cayman Liquidation, the Cayman Islands are the obvious and demonstrable "nerve center" of Niton's ongoing liquidation. Hence, the Cayman Liquidation is a "foreign main proceeding" within the meaning of sections 101(23), 1502(4), 1516(c), and 1517(b)(1) of the Bankruptcy Code.

7.     This and other Courts have recognized similar liquidation proceedings of Cayman Island entities as foreign main proceedings. *See, e.g., In re Suntech Power Holdings Co., Ltd.,* 520 B.R. 399 (SMB) (Bankr. S.D.N.Y. 2014) (commencement of Cayman proceedings, together with subsequent activities of liquidators had the effect of transferring holding company's COMI to Cayman); *In re Millard*, 501 B.R. 644, 647 (Bankr. S.D.N.Y. 2013); *In re AJW Offshore Ltd.,* 13-70078, (Bankr. E.D.N.Y.) (Feb. 5, 2013) same); *In re Saad Inv. Fin. Co. (No. 5) Ltd.,* No. 09-13985 (KG) (Bankr. D. Del. Dec. 17, 2009) (recognizing Cayman Islands liquidation as foreign main proceeding); *In re Bancredit Cayman Ltd. (in Liquidation)*, No. 06-11026 (SMB) (Bankr. S.D.N.Y. Nov. 2, 2007) (same).

8.     Moreover, the precise relief requested here – authorization to take discovery in support of the foreign liquidation and prospective claims arising from the company's transactions within that liquidation -- has been granted recently by this and other courts in virtually identical contexts. *See In re Lawndale Group S.A.,* No. 15-11352 (SCC) (Bankr. S.D.N.Y. July 6, 2015) (recognizing liquidation of British Virgin Islands entity as foreign main proceeding and granting 1521(a)(4) request to engage in intermediary bank discovery regarding claims); *In re Pioneer Freight Futures*, No. 13-12324 (Bankr. S.D.N.Y. Aug. 23, 2013) (recognizing BVI liquidation as foreign main proceeding and granting similar intermediary bank discovery relief); *In re Farenco Shipping Co. Ltd.,* 11-14138 (REG) (Bankr. S.D.N.Y. Sept. 7, 2011) (recognizing BVI liquidation as a foreign main proceeding and granting, *inter alia,* intermediary bank discovery relief sought); *In re Transfield ER Cape Ltd.*, No. 10-106270 (MG) (Bankr. S.D.N.Y. Jan. 13, 2011) (BVI liquidation considered a foreign main proceeding and subsequently, intermediary bank discovery in respect of third party claims sought and obtained without objection on notice to Court); *In re Saad Invs. Fin. Co. (No. 5) Ltd.,* No. 09-13985 (KG) (Bankr. D. Del. Dec. 17, 2009) (recognizing Cayman Islands liquidation as

foreign main proceeding and, in 2014, granting identical intermediary bank discovery relief); *see also In re Tranen Capital Alternative Investment Fund Ltd.*, No. 15-12620 (SHL) (Bankr. S.D.N.Y. Oct. 29, 2015) (recognizing liquidation of similar British Virgin Island Fund structure as a foreign main proceeding and granting principal requested relief - 1521(a)(4) discovery); *In re British American Isle of Venice (BVI), Ltd.*, 441 B.R. 713 (Bankr. S.D. Fla. 2010) (recognition of offshore funds as foreign main proceedings); *In re Grand Prix Assocs., Inc.*, No. 09-16545 (DHS), 2009 WL 1410519 (Bankr. D.N.J. May 18, 2009) (recognizing BVI liquidation as foreign main proceeding);.

9.      Niton maintains tangible and intangible assets in the United States and in this District.

10.      For all of these reasons and as will be shown below, the Liquidators respectfully submit that: (i) the Cayman Liquidation is a foreign main proceeding within the meaning of sections 101(23) and 1502(4) of the Bankruptcy Code; (ii) the Liquidators are the duly appointed foreign representatives of Niton within the meaning of section 101(24); (iii) the Liquidators and the Petition comply with all the requirements of section 1515 and Bankruptcy Rule 1007(a)(4); and (iv) recognition of the Cayman Liquidation would not be contrary to public policy under Bankruptcy Code section 1506.

11.      Under the circumstances, this Court can and should enter an order recognizing the Cayman Liquidation as a foreign main proceeding under section 1517(b)(l), or in the alternative, as a foreign nonmain proceeding under section 1517(b)(2) of the Bankruptcy Code, and granting additional relief as set forth in sections 1507, 1520 and 1521 of the Bankruptcy Code.

## JURISDICTION AND VENUE

12.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and sections 109 and 1501 of the Bankruptcy Code.

13.    Venue of this proceeding is proper in this District pursuant to 28 U.S.C. § 1410(3) because Niton has property in the United States and within this District.

14.    Niton satisfies the property requirement in 11 U.S.C. § 109(a). *See In re Barnet*, 737 F.3d 238, 247-51 (2d Cir. 2013).

15.    Additionally, Niton has both tangible as well intangible assets in New York in the form of potential claims and causes of action. *See In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 370-71, 373 (Bankr. S.D.N.Y. 2014). Entities from which the Liquidators will be seeking discovery also are subject to jurisdiction in this District.

16.    This is a core proceeding under 28 U.S.C. § 157(b)(2)(P).

## FACTUAL BACKGROUND

### Niton's Pre-Liquidation Business

17.    Niton is a Cayman Islands Monetary Authority ("**CIMA**") registered, open-ended, exempted, segregated portfolio company that was incorporated in the Cayman Islands on November 21, 2008 (registration number CD-220073). Leontsinis Declaration, ¶ 9.

18.    By virtue of a resolution of the Liquidators dated June 30, 2015, Niton's registered office was changed from CARD Corporate Services Limited, Zephyr House, 122 Mary Street, P.O. Box 709, Grand Cayman KY1-1107, Cayman Islands, to The R&H Trust Co. Ltd., P.O. Box 897, Windward 1, Regatta Office Park, Grand Cayman KY1-1103, Cayman Islands. Wright Declaration, ¶ 11.

19.    Niton is registered for and on behalf of the Short Term Fund. There are no other portfolios within Niton. The registered holders of participating shares are invested in Niton. Wright Declaration, ¶ 12.

20.    The manager of Niton is Niton Capital Partners S.A. ("**Niton Capital**").  Additionally, Niton Capital Investments Ltd. ("**Niton Investments**") is the sole voting shareholder of Niton.  Wright Declaration, ¶ 13.

21.    STSF Ship Holdings Limited ("**Short Term Holdings**") is the sole wholly owned subsidiary of Niton.  Short Term Holdings in turn is the 100% shareholder of six underlying special purpose vehicles ("**Short Term Holdings SPVs**")[2] and the Short Term Fund is the 100% shareholder of six additional special purpose vehicles (the "**Short Term Fund SPVs**"),[3] which together with the Short Term Holdings SPVs, are considered the "**Niton SPVs**."  Wright Declaration, ¶ 15.

22.    Dubai Trading Agency LLC, which, upon information and belief, is registered in Dubai, United Arab Emirates ("**DTA**"), was the so-called 'commercial manager' of Niton.  The Liquidators understand that DTA is the holding company of a number of offshore companies (the "**DTA Offshore Companies**"),[4] some of which have underlying special purpose vehicles (the "**DTA SPVs**").[5]  Wright Declaration, ¶ 16.

---

[2] Benodar Maritime Inc., Morban Maritime Inc., Nekrata Navigation S.A., Shetara Shipping Limited, Singara Shipping Limited and Trinco Navigation S.A. Wright Declaration, ¶ 15 fn. 1.

[3] Benodar Maritime Inc., Morban Maritime Inc., Nekrata Navigation S.A., Shetara Shipping Limited, Singara Shipping Limited and Trinco Navigation S.A.  Wright Declaration, ¶ 15 fn. 2.

[4] East Star Shipping Holdings Limited, Vectra Finance Limited, Morrito Maritime Inc., Green Star Marine Limited., Navramar Navigation S.A. and Montana Shipping Limited.  Wright Declaration, ¶ 16 fn. 3.

[5] The DTA Offshore Companies' SPV structure is believed to be as follows:

- East Star Shipping Holdings Limited is the 100% shareholder of Baltanas Shipping Limited; Virtad Navigation S.A.; Monteros Maritime Inc.; Navamosa Navigation S.A.; Paruma Maritime Inc.; and Marbird Maritime Inc.

- Vectra Finance Limited is the 100% shareholder of Coral Bay Maritime Inc.; Markon Maritime Inc.; Nattadam Navigation S.A.; Sollyshim Shipping Limited; and Confidence Shipping Limited.

- Morrito Maritime Inc. is the 100% shareholder of Five Star Shipping Limited.

23.     By its updated offering documents, namely, an Offering Memorandum accompanied by an Offering Supplement both dated September 30, 2014 (the "**Offering Documents**"), Niton offered participating shares to prospective investors.   Wright Declaration, ¶ 16.   The investment objective was defined in the Offering Documents as follows:

> the segregated portfolio intends to achieve capital appreciation by diversifying the assets of the segregated portfolio within the investment strategies described below.   The income generated by the segregated portfolio will be reinvested in line with the investment strategies of the segregated portfolio...

24.     The investment strategy of the Short Term Fund was defined as follows:

> the segregated portfolio is focused on acquiring old vessels which will be resold and delivered to demolition yards which will dismantle the ships for steel and other various equipment for recycling (the "**Vessel Transactions**").   The segregated portfolio intends to generate revenues by creating a trading margin between the vessel's sale price and its purchase price increased by all additional operating costs required to transport her from her last voyage destination to the recycling yard .... Wright Declaration, ¶ 17)

25.     Furthermore, the segregated portfolio was entitled to invest any excess cash it held in liquid assets and short term shipping loans.   Wright Declaration, ¶ 18.

26.     In order to carry out its investment strategy, Niton entered into a commercial management agreement with DTA on July 18, 2011.   The commercial management agreement was the subject of two addenda, dated October 16, 2011 and November 23, 2011, respectively (collectively, the "**Commercial Management Agreement**").   Wright Declaration, ¶ 19.

---

- Two other SPVs that are known to the Liquidators within the DTA Offshore Companies' SPV structure exist, namely: Pino Shipping Inc. and DTA Shipping Limited, which do not appear on the DTA structure chart.   Wright Declaration, ¶ 16 fn. 4.

The Liquidators further understand that the DTA Offshore Companies held credit facilities with particular banking institutions (each DTA Offshore Company using a different banking institution) and that the DTA SPVs underlying each respective DTA Offshore Company would ultimately utilize the credit facilities of the respective DTA Offshore Companies' banking facilities).   Wright Declaration, ¶ 16 fn. 4.

27.     In the Commercial Management Agreement, DTA undertook comprehensive operational management of the Vessel Transactions, ostensibly for Niton's benefit, and its duties included, *inter alia*: (i) the sourcing of shipping vessels for purchase; (ii) the facilitation of the purchase of each vessel through negotiation with various ship owners; (iii) negotiations for the sale of the vessels with various demolition yards; (iv) sailing of the vessels to those demolition yards; and (v) negotiations with banking institutions for the provision of credit facilities, which were ultimately used to facilitate the purchase of certain of the vessels. Wright Declaration, ¶ 20.

28.     Purportedly in order to achieve the investment objectives of the Short Term Fund, Niton and DTA formulated complicated transactions between themselves and their respective SPVs. Wright Declaration, ¶ 21

29.     The Liquidators are still investigating each specific Vessel Transaction, but the general nature of those transactions can be summarized as follows (Wright Declaration, ¶ 22):

- DTA, acting as broker, would identify a specific vessel which was for sale. It would then negotiate a specific price for the purchase of that vessel with the particular seller.

- Once DTA had negotiated a price with the seller, which it considered to be advantageous to Niton's investment strategy, it would then negotiate a sale price with a specific demolition yard who would benefit from the dismantling of the vessel.

- If the trading margin between the vessel's sale price and purchase price by the demolition yard was considered to be potentially advantageous to Niton, DTA would prepare a comprehensive budget of the costs and projected profitability for that Vessel Transaction. The budget would then be sent to Niton Capital who would assess and analyze the proposed transaction and would make its recommendation to the investment committee of Niton. Once it had received a recommendation from Niton Capital, the investment committee would decide whether or not to accept or refuse to enter into the particular Vessel Transaction.

- Upon acceptance of the Vessel Transaction by the investment committee, DTA or one of the DTA SPV, would make a down payment of between 10% and 30% to the seller of the vessel. A Niton SPV would then enter into a sale contract with the DTA SPV for the same price for which the DTA SPV had agreed with the seller. In certain instances it

appears that rather than entering into a fresh sale agreement, the initial purchase agreement between the DTA SPV and the seller was merely assigned to Niton's SPV.

- The money required to purchase the vessel from the seller would be provided by either a credit loan from one of the DTA Offshore Company's banking institutions; or, with funds transferred from Niton through the Short Term Fund to the Niton SPV involved in that particular Vessel Transaction.

- DTA would extract a brokerage fee which was equivalent to a percentage of the purchase price with the vessel's seller.

- Once the seller had been paid by the DTA Offshore Company's banking institution, DTA would take physical possession of the boat and, pursuant to the terms of the Commercial Management Agreement, became responsible for sailing the vessel to the particular demolition yard that was acquiring that vessel. DTA would provide the crew and pay the voyage expenses which accrued between the purchase from the seller and final delivery to the demolition yard.

- Upon delivery of the vessel to the demolition yard, the DTA SPV would receive payment from the demolition yard, usually by way of letter of credit in favor of its particular banking institution.

- The DTA SPV would then be paid back the balance of cash less the finance costs owed on the line of credit, from its banking institution.

- DTA would then subtract from that amount all of the voyage expenses, its brokerage commission, the investment committee remuneration fee (which was always $5,000.00); and, a treasury, legal and administrative fee of $7,500.00 which would be paid to Niton Capital.

- The remaining funds, after deductions, would then constitute the net profit owed to the Niton SPV in regard to that particular Vessel Transaction.

### The Related Party Loans

30.    There are two sets of purported loans, all made between 2014 and 2015, totaling approximately $5.1 million, made to parties believed to be related to Niton or to the directors of Niton and Niton Capital (the "**Related Party Loans**"). The Liquidators' investigation of the Related Party Loans is ongoing. Wright Declaration, ¶ 24.

31.    The Liquidators currently understand that, for all of the Related Party Loans, no directors' resolutions authorizing the execution of the loans on behalf of the respective companies exist. The Liquidators were informed by the Cayman-domiciled independent director of Niton, Mr. Guilfoyle, that due to the fact that directors of both the borrower and lender companies had signed the relevant loan agreements, no resolution was required. Wright Declaration, ¶ 24.

### The Medium Term Fund Loans

32.    The Medium Term Shipping Fund (the "**Medium Term Fund**") is a company incorporated under the laws of Malta, and is understood to be the wholly owned subsidiary of the Niton Master Fund SICAV/Niton Fund SICAV (the "**Niton Fund SICAV**"), which for all relevant intents and purposes seems to be identical to the Niton-Short Term Fund structure at issue in this case. Wright Declaration, ¶ 25.

33.    If one were to create a structure chart for the Niton Fund SICAV, the Medium Term Fund apparently would be the equivalent company in that structure as the Short Term Fund is in the Niton structure. Wright Declaration, ¶ 26.

34.    The Liquidators understand that DTA also is the commercial manager of Niton Fund SICAV, and that the current directors of the Medium Term Fund include some of the former directors of Niton and the Short Term Fund. As such, the Liquidators consider the Medium Term Fund to be a related party to Niton. Wright Declaration, ¶ 27.

35.    Niton made loans to the Medium Term Fund in the amount of $600,000, $1,000,000 and $200,000 on December 1, 2, and 15, 2014, respectively (the "**Medium Term Fund Loans from Niton**"). Wright Declaration, ¶ 28.

36.    The Medium Term Fund Loans from Niton were made repayable by the Medium Term Fund three months from their execution date or demand received and interest was set at 9%.

These loans were subsequently extended. However, notwithstanding said extensions, the Medium Term Fund Loans from Niton are past due, and the Medium Term Fund has only repaid a total of $100,000 against the total balances outstanding. Wright Declaration, ¶ 29.

37.    Additionally, on March 18, 2014 and April 2, 2014, respectively, Short Term Holdings, made loans to the Medium Term Fund in the respective amounts of $1.1 million and $1.3 million ("**Medium Term Fund Loans from Short Term Holdings**").    The loan terms were purportedly three months, with no "on demand" option, and the interest was set at 9%. While these loans were similarly extended, notwithstanding said extensions, the Medium Term Fund Loans from Short Term Holdings are past due. In the case of the March 18, 2014 loan, the directors purportedly extended that loan, partially, in the amount of $900,000, however, it remains unclear as to whether the Medium Term Fund repaid the difference of $200,000 to Short Term Holdings or not.    In any event, apart from a purported decrease of $200,000 to the March 18, 2014 loan, the Medium Term Fund has not repaid either the capital or the interest accrued on either the March 18, 2014 loan or the April 2, 2014 loan.    (Collectively, the two sets of Medium Term Fund loans are referred to as the "**Medium Term Fund Loans**").    Wright Declaration, ¶ 30.

## The Cor Asset Pool Limited Loan

38.    On September 2, 2014, purportedly in accordance with Niton's investment strategy, Niton made a loan to an entity called Cor Asset Pool Limited ("**CAPL**") in the amount of $195,000, later increased to $200,000 at 4% interest (the "**CAPL Loan**").    Via a series of extensions and restructurings, the CAPL Loan was set to renew automatically, such that it would only be due and payable on the cancellation of the loan agreement by one of the parties.    To date, $135,000 of the CAPL Loan has been repaid.    Interest continues to accrue on the outstanding balance.    Wright Declaration, ¶ 31.

## Events Leading Up to the Cayman Liquidation

39.    It appears that at the end of 2014 and during the beginning of 2015, in accordance with the terms of the Offering Documents,  Niton received a number of redemption requests in the aggregate of $5,701,784.15, which were payable up to and including August 3, 2015 (the "**Redemption Requests**").  Wright Declaration, ¶ 32.

40.    None of the Redemption Requests were paid in full by Niton to any of the redeeming investors.  Having missed five payment due dates, the Niton directors convened a meeting of the board of directors on June 2, 2015 (the "**June 2 Meeting**").  According to the minutes of the June 2 Meeting, the Niton directors noted that the current cash balances held at Niton's banks were insufficient to meet the outstanding Redemption Requests and that "*immediate and urgent action*" would be needed to realize funds in order to meet the segregated portfolio's cash flow requirements. In fact, the Cayman Liquidation Petition indicates that as of the beginning of January 2015, Niton was unable to pay its debts as they came due.  Wright Declaration, ¶ 33.

41.    Accordingly, at the June 2 Meeting, the Niton directors resolved to suspend redemptions in respect of participating shares in Niton, and further, to delay payment of redemption proceeds with respect to past Redemption Requests, effective immediately and in accordance with paragraph 20.11 of Niton's Articles of Association.  Wright Declaration, ¶ 34.

42.    Also at the June 2 Meeting, the Niton directors were informed that DTA had advised Niton Capital that certain financial irregularities had been discovered within DTA's London operation and that they were currently being investigated.  Wright Declaration, ¶ 35.  According to the minutes of the June 2 Meeting, DTA was holding funds due to Niton rather than immediately transferring them back to the segregated portfolio purportedly in order to facilitate new purchases of ships in an efficient manner so as to obtain sufficient credit facilities with banking institutions that

DTA claimed were easier to source at the DTA level rather than at the Niton level.    Wright Declaration, ¶ 36.

43.    Thereafter, Niton was informed that one of DTA's employees, who was responsible for drafting DTA's 2014 balance sheet, had defrauded DTA.    Although it is believed that one hundred and three Vessel Transactions had taken place between Niton and DTA, it is not clear which of the Vessel Transactions were contracted for and on behalf of Niton, and which were contracted for and on behalf of other DTA clients.    In addition, the Liquidators understand that DTA's operations were down to a bare minimum because the scrap market had considerably dropped.    Wright Declaration, ¶ 37.

44.    Accordingly, DTA and/or the DTA Offshore Companies and its SPVs could thus potentially hold up $36,893,950.00 on behalf of Niton and the segregated portfolio.    DTA disputes this figure.    The Liquidators have requested and have been provided with some supporting documentation relating to the transactions with DTA under the Commercial Management Agreement, or related to the Commercial Management Agreement, but these will need to be reconciled in due course.    Significant information requests remain outstanding.    Wright Declaration, ¶ 38.

45.    On June 16, 2015, a Statutory Demand was served on the registered office of Niton by attorneys for a Niton shareholder.    The shareholder had previously sought, but not received any proceeds in respect of a Redemption Request of its shares in the segregated portfolio.    Wright Declaration, ¶ 39.

46.    After receipt of the Statutory Demand, the Niton directors convened a meeting on June 22, 2015, at which they voted to recommend to Niton Investments, Niton's sole voting shareholder, that Niton's affairs should be wound up and that it should be placed into voluntary liquidation as expeditiously as possible.    Wright Declaration, ¶¶ 39-40.    Thereafter, on June 24, 2015, Niton

Investments resolved to place Niton into voluntary liquidation and appointed Messrs. Wright and Kennedy of RHSW (Cayman) Limited ("**RHSW**"), an affiliate of Rawlinson & Hunter, a respected accounting, international accounting and trust firm, as its joint voluntary liquidators.    Wright Declaration, ¶ 40.

47.    As matters currently stand, the Liquidators have identified the following potential debts/creditors of Niton (Wright Declaration, ¶ 42):

a.    The unpaid, redeemed shareholders of Niton, whose potential claims total: $2,857,304.20 (as of June 2, 2015);

b.    Unpaid Redemption Requests by shareholders of Niton, whose potential claims total: $2,462,187.25 (post-June 2, 2015);

c.    Management and performance fees allegedly owed to Niton Capital in the approximate amount of $296,123.32 and $600,953.16, respectively;

d.    Commercial management fees alleged owed to DTA in the approximate amount of $713,205.89; and

e.    Service provider fees, including, registered office fees, attorneys' fees, and administrators' fees which amount to approximately $145,000.

48.    The Liquidators believe that they may identify additional creditors of Niton in connection with their ongoing investigation of Niton's business.  Wright Declaration, ¶ 43.

49.    Niton's primary assets are still being investigated.  At present, the Liquidators are investigating, *inter alia*: (i) potential claims and causes of action to recover amounts due to Niton from DTA, the DTA Offshore Companies, and the DTA SPVs under the Commercial Management Agreement, or relating to the Commercial Management Agreement, (ii) various causes of action in respect of the Medium Term Loans and CAPL Loan made to the Medium Term Fund and CAPL

respectively, as well as (iii) potential claims for breach of fiduciary duty and breach of contract that may be asserted against Niton's directors and management. Wright Declaration, ¶ 44.

### The Cayman Liquidation and Cayman Law on Insolvency

50.    On July 15, 2015, the Liquidators filed a petition under section 124 of the Cayman Companies Law with the Cayman Court (the "**Cayman Liquidation Petition**") seeking entry of an order (i) permitting the Niton liquidation to continue under the supervision of the Cayman Court, (ii) appointing Messrs. Wright and Kennedy as Liquidators of Niton, and (iii) granting the Liquidators certain powers as described in the Cayman Liquidation Petition and as will be discussed in more detail below.  Leontsinis Declaration, ¶ 12.  The Cayman Liquidation Petition indicates that as of the beginning of January 2015, Niton was unable to pay its debts as they came due.  Wright Declaration, ¶ 33.

51.    The Cayman Court filed its Order granting the Cayman Liquidation Petition on July 31, 2015 (the "**Cayman Liquidation Order**").   A true and correct copy of the Cayman Liquidation Order is attached to the Declaration of Mr. Wright as Exhibit A.  Thereafter, on October 20, 2015, the Cayman Court entered an order authorizing the Liquidators to retain U.S. counsel for the purpose of filing this Petition.  A copy of the Liquidators' October 20, 2015 application and resultant order are attached to Mr. Wright's Declaration as Exhibit B.

52.    The substantive law relating to the winding up of companies incorporated in the Cayman Islands is contained in Part V of the Cayman Companies Law.[6]  The provisions of Part V apply to companies formed and registered under the Cayman Companies Law or its

---

[6] There are additional statutes relating to the winding up of those Cayman Islands companies that are regulated by the CIMA, such as banks and insurance companies  Leontsinis Declaration, ¶ 25 fn 7

predecessors, including companies that are formed as exempted companies, and foreign companies in respect of which the Cayman Court has made a winding up order. Leontsinis Declaration, ¶ 25.

53.     The Cayman Companies Law provides for three different modes for winding up Cayman Islands companies, although there is considerable overlap of provisions relating to each system and relating to the powers and duties of the liquidators. They are: (i) winding up by order of the Cayman Court, (ii) voluntary winding-up initiated by a resolution of the shareholders, and (iii) voluntary winding-up initiated by a resolution of the shareholders but subject to the supervision of the Cayman Court. In this case, the winding up of Niton was initiated through a voluntary resolution of the voting shareholder, but is now subject to the supervision of the Cayman Court, and the Liquidators have been appointed as the joint official liquidators. Leontsinis Declaration, ¶ 26.

54.     The substantive law contained in Part V of the Cayman Companies Law is supplemented by detailed rules governing the practice and procedure for insolvencies of companies that are set out in the Company Winding Up Rules 2008 (as amended) ("**CWR**"), the Insolvency Practitioners Regulations 2008 (as amended) ("**Regulations**") and the Grand Court Rules 1995 (as amended) ("**GCR**"), together with a detailed body of local case law. Leontsinis Declaration, ¶ 27.

55.     Pursuant to section 92 of the Cayman Companies Law, a company may be wound up by the Cayman Court if, among other things, the company has passed a special resolution requiring the same or if it is unable to pay its debts as they come due. The test that is applied to determine whether a company is unable to pay its debts is based on a cash-flow test of solvency. Pursuant to section 94 of the Cayman Companies Law, a creditor (including any contingent or prospective creditor), contributory (which for all practical purposes means a shareholder), or the company can petition for the compulsory winding-up of a company on the grounds set out in

section 92.[7]  In this case, the winding up petition was filed on behalf of Niton by the Liquidators, after the resolution for such action was passed by the Company's voting shareholder.  Leontsinis Declaration, ¶ 28.

56.     An official liquidator is an officer of the Cayman Court.  Pursuant to section 110 of the Cayman Companies Law, his function is to "(a) collect, realize and distribute the assets of the company to its creditors and if there is a surplus, to the persons entitled to it, and (b) to report to the company's creditors and contributories upon the affairs of the company and the manner in which it has been wound up." Leontsinis Declaration, ¶ 29.

57.     Except as otherwise ordered by the Cayman Court, schedule 3 to the Cayman Companies Law sets out the powers that an official liquidator may exercise with and without the supervision of the Cayman Court.  Leontsinis Declaration, ¶ 30.  For example, generally, an official liquidator is authorized and empowered to take the following actions subject to the Cayman Court's supervision, and any creditor or party in interest may apply to the Cayman Court with respect to the exercise or proposed exercise of such powers:

     a.  Bring or defend any action or other legal proceeding in the name and on behalf of the company;

     b.  Carry on the business of the company so far as may be necessary for its beneficial winding up;

     c.  Dispose of any property of the company to a person who is or was related to the company;

     d.  Pay any class of creditors in full;

     e.  Make any compromise or arrangement with creditors or persons claiming to be creditors;

     f.  Compromise debts and liabilities between the company and a contributory or alleged contributory debtor or person apprehending liability to the company;

---

[7] CIMA may also do so if the company is carrying on regulated business  Leontsinis Declaration, ¶ 25 fn 7

g.  Deal with all questions in any way relating to or affecting the assets or the winding up of the company, to take any security for the discharge of such call, debt, liability or claim, and to give a complete discharge in respect of it;

h.  Sell any of the company's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels;

i.  Raise or borrow money and grant securities therefor over the property of the company;

j.  Engage staff to assist in the performance of his duties; and

k.  Engage attorneys and other professionally qualified persons to assist him in the performance of his duties.

*See* Cayman Companies Law, Section 110, Schedule 3, Part 1.

58.  Schedule 3 further provides that an official liquidator is permitted to exercise the following powers without the Cayman Court's supervision:

a.  Take possession of, collect, and get in the property of the company, and for that purpose to take all such proceedings as he considers necessary;

b.  To do all acts and execute in the name and on behalf of the company all deeds, receipts, and other documents, and for that purpose, to use the company seal;

c.  To prove, rand, and claim in the bankruptcy, insolvency or sequestration of any contributory for any balance against his estate and to receive dividends in the bankruptcy, insolvency, or sequestration in respect of that balance as a separate debt due from the bankrupt or insolvent and rateably with other creditors;

d.  To draw, accept, make, and indorse any bill of exchange or promissory note in the name and on behalf of the company as if made by the company;

e.  To promote a scheme of arrangement;

f.  Convene a meeting of creditors and contributories; and

g.  To do all other things incidental to the exercise of his powers.

*See* Cayman Companies Law, Section 110, Schedule 3, Part 2.

59.  In this case, the Cayman Court has authorized the Liquidators to exercise certain of the Schedule 3 powers without supervision. In particular, the Cayman Court has authorized the

Liquidators to: (i) bring or defend legal proceedings in Niton's name, (ii) dispose of any property of Niton to a person who is or was related to Niton; (iii) compromise debts and liabilities between Niton and a contributory or alleged contributory or other person apprehending liability to Niton; (iv) sell any of Niton's property by public auction or private contract with power to transfer the whole of it to any person or to sell the same in parcels; and (v) to engage attorneys in various jurisdictions to assist the Liquidators in the performance of their functions from time to time as may be necessary. *See* Cayman Liquidation Order, ¶ 4. As noted in the Leontsinis Declaration, it is fairly common for the Cayman Court to provide official liquidators with such authority. Leontsinis Declaration, ¶ 32. The Cayman Court also has authorized the Liquidators to retain U.S. counsel, the purpose of which retention was to file this Petition seeking recognition of the Cayman Liquidation under Chapter 15, as well as the additional relief under the Bankruptcy Code eligible to foreign representatives. Leontsinis Declaration, ¶ 32.

60.     Under the Cayman Companies Law, the official liquidator is also empowered to investigate (i) the causes for the failure of the debtor company's business, as well as (ii) generally, the promotion, business, dealings and affairs of the debtor company. *See* Cayman Companies Law, Section 102. A key principle underlying the Cayman Companies Law and the Cayman Liquidation is that the claims of investors and creditors within the same class are treated on a *pari passu* basis. *See* Cayman Companies Law, Section 140.

61.     Cayman liquidation proceedings are fair and equitable. All creditors may have an opportunity to be heard by the Cayman Court and no creditor will be prejudiced because it is foreign-based. Leontsinis Declaration, ¶ 35.

62.     Section 97(1) of the Cayman Companies Law provides that upon the entry of a winding up order, no suit or other proceeding may be commenced or continued against the company

except with leave of the Cayman Court and subject to such terms as that Court might impose.  This automatic stay mirrors the stay imposed in U.S. bankruptcy proceedings and serves to promote the Liquidators' ability to deal with claims and creditors collectively and comprehensively.  Leontsinis Declaration, ¶ 36.

63.    Additionally, under the laws of the Cayman Islands, the official liquidators have a duty to realize all assets of Niton, including through the investigation and prosecution of claims Niton may hold against third parties.  Leontsinis Declaration, ¶ 37.

### Niton's Activities in the Cayman Islands

64.    Niton was formed under the laws of the Cayman Islands and maintained its registered office in the country.  Leontsinis Declaration, ¶ 9.  As noted above, Niton was established as a Cayman Islands registered, open-ended, exempted, and segregated portfolio company.  Leontsinis Declaration, ¶ 50.

65.    A company incorporated under the Cayman Companies Law may be established as an "exempted" company or as an "ordinary" company.  Both types of companies are required to make certain annual statutory filings with the Cayman Islands Registrar of Companies ("**Registrar**").  Leontsinis Declaration, ¶ 50.  However, an "exempted" company differs in that it is prohibited from undertaking business in the Cayman Islands except in furtherance of its business carried on outside the Cayman Islands.[8]  Specifically, it may effect and conclude contracts in the Cayman Islands and exercise in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands (so it may employ staff or agents in the Cayman Islands or have offices in the

---

[8] Requirements are such that the operation of the proposed company must be " *conducted mainly outside the* [Cayman] *Islands* " *See* sections 163 and 165 of the Cayman Companies Law  Exempted companies are also required to file an annual return with the Registrar to this effect, along with its annual fees, pursuant to section 168(b) of the Cayman Companies Law

Cayman Islands in furtherance of its business outside the Cayman Islands once it has obtained any appropriate trade licenses). Leontsinis Declaration, ¶ 50.

66.    Although upon its incorporation Niton was restricted from carrying on business within the Cayman Islands, this did not mean that Niton had no presence there.  For example, Niton's registered office prior to the commencement of the voluntary liquidation was located at CARD Corporate Services Limited, Zephyr House, 122 Mary Street, P.O. Box 709, Grand Cayman, KY1-1107, Cayman Islands, where Niton's annual filings with the Registrar were made.  Niton's Registers also were maintained in the Cayman Islands, including its Register of Members, although "exempted" companies are not specifically obliged under the Cayman Companies Law to do so.  So too, under the law of the Cayman Islands, situs of the shares of a Cayman Islands company is the place of its incorporation, *i.e.* the Cayman Islands.  *See 160088 Canada Incorporated v. Socoa International Limited* [1998] CILR 256.   In addition, Niton was regulated by CIMA from its headquarters in the Cayman Islands.  Leontsinis Declaration, ¶ 51.

67.    The restriction on the carrying on of an "exempted" company's business inside the Cayman Islands also does not apply after a company commences liquidation in the Cayman Islands. Once Niton was placed into voluntary liquidation, its registered office was transferred to The R&H Trust Co., Ltd., P.O. Box 897, Windward 1 Regatta Office Park, Key West Bay Road, Grand Cayman, KY1-1103, Cayman Islands, for the purpose of the liquidation. In addition, it is a requirement of Cayman Islands law that at least one official liquidator be resident in the Cayman Islands. Leontsinis Declaration, ¶ 53.

68.    Moreover, Niton issued and received voluminous documentation while it was operating.  In all such documentation, Niton is referred to and addressed as a Cayman company. Based upon the board meetings, statutory demands and resolutions to wind up Niton, shareholders

meetings and the voluntary liquidation of Niton itself, all of which focused on the Cayman Islands, it is clear that all relevant creditors, stakeholders, and shareholders regard Niton to be a Cayman company. Wright Declaration, ¶ 53.

69.    In this case, both Liquidators are residents of the Cayman Islands. Leontsinis Declaration, ¶ 53. Since their appointment, the Liquidators have overseen and directed all activities related to Niton from the Cayman Islands. Wright Declaration, ¶ 62. A significant proportion of the work to date relating to the Cayman Liquidation, including work carried out both pre and post the filing of the Cayman Liquidation Petition, has been conducted in the Cayman Islands, and all of the work is supervised by the Liquidators and ultimately subject to the supervision of the Cayman Court. Wright Declaration, ¶ 54.

70.    Initially, the Liquidators caused the requisite notices and filings to be filed, published, and served in the Cayman Islands, and arranged for the transfer of Niton's books and records to the new registered office in the Cayman Islands. Wright Declaration, ¶ 55.

71.    The Liquidators also took steps to protect Niton's assets. For example, the Liquidators reconstituted the board of directors of Short Term Holdings and of the twelve Niton SPVs, and installed the Liquidators as its directors. The registered officers of Short Term Holdings, the Short Term Fund and the Niton SPVs have been informed of the reconstitution of their respective boards of directors, as have the banks that serve all of the companies within the Niton Structure. All of these actions were taken from the Cayman Islands. Wright Declaration, ¶ 56.

72.    As a result, the complete structure of Niton and its related entities is now under the Liquidators' control from the Cayman Islands. Wright Declaration, ¶ 57.

73.    Concerning the $36,893,950 purportedly owed by DTA, the DTA Offshore Companies and/or the relevant DTA SPVs, the Liquidators have sent more than 40 demand letters to

DTA, the DTA Offshore Companies and the relevant DTA SPVs from their offices in the Cayman Islands seeking payment of the relevant amounts owed pursuant to the Commercial Management Agreement. Wright Declaration, ¶ 58.

74.     The Liquidators also have taken control of Niton's bank accounts, the proceeds of which are held in, or are in the process of being transferred to, the Cayman Islands. The Liquidators also have retained counsel and have arranged for the issuance of numerous letters of demand in relation to amounts due to Niton, including with respect to the Related Party Loans. To date, approximately $265,000 has been recovered. Wright Declaration, ¶ 59.

75.     The Liquidators likewise have attended numerous conference calls with the former directors of Niton, Short Term Holdings, the Niton SPVs and the investment manager to try to understand the Niton structure; Niton's day to day operations; Niton's relationship with DTA and its related parties; and, the investment strategies employed by the investment manager and the investment committee. As a result of these meetings, extensive documentation has been received and is stored in the Cayman Islands. The Liquidators have performed a thorough review of these documents in the Cayman Islands to attempt to understand Niton's financial position, identify potential assets/liabilities, and reconcile the financial records to underlying supporting documentation. The Liquidators continue to follow up on outstanding document requests in order to determine the veracity of the information provided. Wright Declaration, ¶ 60.

76.     The Liquidators have also spent dozens of hours corresponding and meeting with stakeholders and responding to their queries/concerns surrounding the Cayman Liquidation. The first stakeholder meeting was held on September 3, 2015, at which the Liquidators' first report was presented and the liquidation committee was formed. Based on investigations to date, the Liquidators are developing a litigation strategy with Cayman, Swiss, UK and US counsel. All of the foregoing

activities have taken place in or been directed from the Liquidators' offices in the Cayman Islands. Wright Declaration, ¶ 62.

77.    As the Liquidators' investigations continue, the relationships of Niton and related companies, its operations and potential claims against counterparties are becoming clearer. Potential claims will be overseen, managed and resolved (by litigation or negotiation) by the Liquidators from the Cayman Islands, subject to oversight by the Cayman Court. Wright Declaration, ¶ 63.

### Additional Relief Requested

78.    In addition to recognition of the Cayman Liquidation as a foreign main proceeding, the Liquidators respectfully request relief pursuant to the Bankruptcy Code, *inter alia*, in the form of an order authorizing discovery pursuant to 11 U.S.C. 1521(a)(4).

79.    Niton's potential claims against third parties broadly fall into three categories: (i) claims currently believed to be in the range of $36,893,950.00 against DTA, the DTA Offshore Companies and/or the DTA SPVs relating to the Commercial Management Agreement (the "**Commercial Management Agreement Claims**"); (ii) claims arising from the "loans" in respect of Medium Term Fund and CAPL, which loans are believed to have been utilized to purchase vessels for the use and benefit of the Medium Term Fund and DTA (the "**Insider Loan Claims**"); and (iii) claims against directors and management for breach of fiduciary duty in relation to the unusual relationship among DTA, the Medium Term Fund, and Niton (the "**Duty Claims**"). Wright Declaration, ¶ 66. As noted at the outset of the Petition, collectively, Niton, its direct and indirect subsidiaries, DTA, the DTA Offshore Companies, the Medium Term Fund, CAPL, and any related persons and entities who may have received transfers from Niton or its direct or indirect subsidiaries are described herein as Discovery Subjects. *See supra*, Intro, § (iii)(a).

80.    Critical information concerning the foregoing Claims and the Discovery Subjects is located in the United States in the form of wire transfer records maintained by intermediary banks located in New York.  Wright Declaration, ¶ 67.  In particular, all three of these Claims require accurately tracing and re-creating the flow of funds pertaining to the U.S. dollar-denominated Vessel Transactions.  Wright Declaration, ¶ 68.  The quantum of the Commercial Management Agreement Claims will depend on the precise profits and losses realized with respect to the dozens of vessels purchased, sold and re-sold on Niton's behalf during the relevant time period.  Wright Declaration, ¶ 69.

81.    With respect to the Insider Loan Claims, determining the liquidity of and bank accounts of these loans' initial transferees is critical to execute upon those loans in respect of the undisputed portion of these debts, as well as any civil claims that may arise in connection with the insider nature of these transactions.  Moreover, once it can be proved precisely how these funds were utilized, recoveries via tracing litigation and/or seizure of the relevant vessels can be obtained.  Wright Declaration, ¶ 70.

82.    Concerning the Duty Claims, while the Liquidators are still investigating the investment purpose and details surrounding the investments made on Niton's behalf by DTA in connection with the Commercial Management Agreement, DTA has represented that an unusual number of the Commercial Management Agreement transactions resulted in "losses" to Niton, raising the question of whether these were appropriate investments and whether breach of duties occurred.  The financial information relevant to the investigation of the Duty Claims is similar to the Commercial Management Agreement Claims.  Wright Declaration, ¶ 71.

83.    Whereas all or substantially all of the relevant transactions were effected via U.S. dollar-denominated wire transfers, the Liquidators respectfully submit that discovery as to the nature

and propriety of Niton's U.S. dollar-denominated transactions in relation to the Commercial Management Agreement Claims, the Insider Loan Claims, and the Duty Claims is critical to their investigation and to the Liquidators' ability to obtain a recovery for Niton's creditors and investors. Wright Declaration, ¶ 72.

84.     The wire transfer information sought is located in the United States in the form of wire transfer records maintained by intermediary banks located in New York.   Wire transfers in U.S. dollars to and from parties anywhere in the world are processed by intermediary or correspondent banks, the majority of which are located in New York.  Gluck Declaration, ¶ 5.

85.     The Liquidators are seeking information concerning previously executed wire transfers only.  Gluck Declaration, ¶ 3.  The Liquidators seek records of those wire transfers that occurred before Niton was placed into liquidation to ascertain where Niton's funds were disbursed, transferred or otherwise dissipated as more fully set forth in respect of the three categories of claims. Such records are maintained by the intermediary banks and are frequently produced by the banks in response to discovery requests without objection.  Gluck Declaration, ¶ 6.

86.     Under the circumstances, the Liquidators respectfully request that pursuant to 11 U.S.C. § 1521(a)(4), the Court allow them to commence discovery in the United States with respect to the Discovery Subjects in relation to Niton and its direct and indirect subsidiaries.  Based on the investigation of the Liquidators in the Cayman Liquidation, each of the Discovery Subjects has transacted business in U.S. dollars.  Wright Declaration, ¶ 74.

87.     Obtaining this information will substantially assist the Liquidators in realizing assets of Niton and determining whether, where, and how Niton should commence actions against third parties. Wright Declaration, ¶ 75.  Further discovery, including subpoenas for the production of documents and deposition testimony from non-banking entities that may be subject to United States

jurisdiction, may be required in order to understand the relationship of each of the Discovery Subjects to Niton. Wright Declaration, ¶ 74. The Liquidators also respectfully request that the Court grant authority to assert claims against parties and assets that are subject to jurisdiction in the United States to the extent they deem such action appropriate.

## ARGUMENT

## I.    THE CAYMAN PROCEEDING SHOULD BE RECOGNIZED UNDER CHAPTER 15

88.    Section 1517 of the Bankruptcy Code mandates entry of an order recognizing a "foreign proceeding" if it appears that recognition will not undermine U.S. public policy and: "(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign non-main proceeding within the meaning of section 1502; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of section 1515." 11 U.S.C. § 1517(a).

89.    Each of those requirements is met here, and entry of an order in the form of Exhibit A to this Petition will significantly aid the Liquidators' efforts to administer Niton's assets and liabilities, discover information necessary to the winding up of Niton's ongoing business affairs and proceedings, and ensure a fair and equitable treatment of and greater distributions to Niton's creditors and interest holders.

### A.    The Cayman Liquidation is a Foreign Proceeding and the Liquidators Are Foreign Representatives

90.    Section    101(23)    of    the    Bankruptcy    Code    defines    a    foreign proceeding as:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the

> debtor are subject to control or supervision by a foreign court, for the
> purpose of reorganization or liquidation.

11 U.S.C. § 101(23). This definition incorporates the term foreign representative, which the

Bankruptcy Code in turn defines as "a person or body, including a person or body appointed on an

interim basis, authorized in a foreign proceeding to administer the reorganization or liquidation of the

debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C.

§ 101(24). There is no question that the Liquidators and the Cayman Liquidation satisfy each of

these requirements.

91.    First, the Cayman Liquidation is a judicial proceeding in a foreign country, the

Cayman Islands, subject to the control and supervision of the Cayman Court. Leontsinis Declaration,

¶ 32. All claims against Niton may be submitted in the Cayman Liquidation and all claimants have

the right to access the Cayman Court and appeal decisions of the Liquidators. Leontsinis Declaration,

¶¶ 35, 46.

92.    Second, the Cayman Liquidation is being conducted by the Liquidators, who were

appointed by the Cayman Court pursuant to the Cayman Companies Law as joint official liquidators

to oversee the winding up of Niton according to the provisions of the Cayman Companies Law.

Leontsinis Declaration, ¶ 14. As such, the Liquidators each are a "person authorized in a foreign

proceeding to administer the reorganization or the liquidation of [Niton's] assets or affairs," within

the meaning of section 101(24).

93.    Third, the relevant portions of the Cayman Companies Law and related rules that

govern the Cayman Liquidation specifically relate to proceedings in the Cayman Islands concerning

"insolvency or adjustment of debt." 11 U.S.C. § 101(23).

94.     Finally, the Cayman Liquidation is a "collective … proceeding" because it "considers the rights and obligations of all creditors." *See, e.g., In re Ashapura Minechem Ltd.*, No. 11-14668 JMP (Bankr. S.D.N.Y. Nov. 22, 2011) (quoting *In re Betcorp Ltd.*, 400 B.R. 266, 281 (Bankr. D. Nev. 2009)); *In re Gold & Honey, Ltd.*, 410 B.R. 357, 370 (Bankr. E.D.N.Y. 2009) (citations omitted). Among other tasks, the Liquidators currently are in the process of collecting and assessing claims from all of Niton's creditors, have met with Niton stakeholders and formed a liquidation committee to work with them on the Cayman Liquidation.

95.     As discussed above, numerous courts in this and other districts have found that official liquidation proceedings brought pursuant to the Cayman Companies Law qualify as a "foreign proceeding," and that and joint official liquidators appointed and overseen by the Cayman Court qualify as a "foreign representative" for purposes of section 101(23) and (24). *See, e.g., In re Suntech Power Holdings Co., Ltd.,* 520 B.R. 399 (SMB) (Bankr. S.D.N.Y. 2014) (commencement of Cayman proceedings, together with subsequent activities of liquidators, had the effect of transferring COMI to Cayman); *In re Millard*, 501 B.R. 644, 647 (Bankr. S.D.N.Y. 2013) (bankruptcy proceeding in the Cayman Islands met all of the statutory requirements of Section 1517, and therefore was recognized as a foreign main proceeding); *In re AJW Offshore Ltd.,* No. 13-70078, (Bankr. E.D.N.Y. Feb. 5, 2013); *In re Saad Inv. Fin. Co. (No. 5) Ltd.,* No. 09-13985 (KG) (Bankr. D. Del. Dec. 17, 2009) (recognizing Cayman Islands liquidation as foreign main proceeding); *In re Bancredit Cayman Ltd. (in Liquidation)*, No. 06-11026 (SMB) (Bankr. S.D.N.Y. Nov. 2, 2007); *In re MMG LLC*, 256 B.R. 544, 550 (Bankr. S.D.N.Y. 2000) (same).

**B.     The Cayman Liquidation is a Foreign Main Proceeding**

96.     In the absence of evidence to the contrary, the debtor's registered office, here the Cayman Islands, is presumed to be its COMI. 11 U.S.C. §1516(c). Here, there is no such evidence.

97.     As discussed in detail above, although Niton was formed as an "exempt" company, it

nevertheless maintained a registered office in the Cayman Islands even before the commencement of

the Cayman Liquidation, and its documents and other correspondence made it clear that Niton was a

Cayman company.  Leontsinis Declaration, ¶¶ 50-51.

98.     In any case, a foreign debtor's COMI is determined at the time the Chapter 15 petition

is filed, and the Second Circuit has held "that a debtor's COMI should be determined based on its

activities at or around the time the Chapter 15 petition is filed, as the statutory text suggests." *In re*

*Fairfield Sentry Ltd.,* 714 F.3d 127, 137 (2d Cir. 2013); *In re Millennium Global Emerging Credit*

*Master Fund Limited,* 458 B.R. 63 (Bankr. S.D.N.Y. 2011) (describing same COMI test in respect of

similar Bermuda fund structure).

99.     On this basis, numerous similar offshore funds and structures have been recognized by

this Court as foreign main proceedings pursuant to Chapter 15.  *See In re Tranen Capital Alternative*

*Investment Fund Ltd.,* 15-12620 (Bankr. S.D.N.Y. Oct. 29, 2015) (SHL) (recognizing liquidation of

similar British Virgin Island Fund structure as a foreign main proceeding and granting principal

requested relief - 1521(a)(4) discovery); *In re Lawndale Group S.A.,* No. 15-11352 (SCC) (Bankr.

S.D.N.Y. July 6, 2015) (recognizing liquidation of British Virgin Islands entity as foreign main

proceeding); *In re Pioneer Freight Futures,* No. 13-12324 (Bankr. S.D.N.Y. Aug. 23, 2013)

(recognizing BVI liquidation proceeding as foreign main proceeding); *In Re Farenco Shipping Co.*

*Ltd.,* No. 11-14138 (REG) (Bankr. S.D.N.Y Sept. 7, 2011) (same); *In re Transfield ER Cape Ltd.,*

No. 10-106270 (MG) (Bankr. S.D.N.Y. Jan. 13, 2011) (same); *see also In re British American Isle of*

*Venice (BVI), Ltd.,* 441 B.R. 713 (Bankr. S.D. Fla. 2010) (recognition of offshore funds as foreign

main proceedings); *In re Grand Prix Assocs., Inc.,* No. 09-16545 (DHS), (Bankr. D.N.J. May 18,

2009) (same); *In re Saad Invs. Fin. Co. (No. 5) Ltd.*, No. 09-13985 (KG) (Bankr. D. Del. Dec. 17, 2009) (Cayman fund).

100.    It is well-established that in determining an entity's COMI, courts consider any relevant factors, including: (i) the location of the debtor's assets; (ii) the location of the debtor's books and records; (iii) the location of the majority of the debtor's creditors; (iv) the commercial expectations and knowledge of the debtor's creditors; and (v) the location of those who actually manage the debtor. *See, e.g., In re Suntech Power Holdings Co., Ltd.*, 520 B.R. at 416 (citing cases and describing consideration of the debtor's "nerve center" including from where the debtor's activities <u>are</u> controlled). As an initial matter, substantial Niton assets - including its known liquid assets (i.e., Niton's bank account balance) - are now located in, or are in the process of being transferred to, the Cayman Islands. Wright Declaration, ¶ 51.

101.    Applying the foregoing factors to this case, there is no doubt that Niton's COMI is the Cayman Islands. Since the commencement of the Cayman Liquidation, all activities associated therewith have been conducted and/or overseen by the Liquidators from the Cayman Islands. Among other things, the Liquidators filed all necessary notices and displaced the existing boards of directors of Niton and its subsidiaries and assumed their duties, are engaged in the process of investigating and assessing the claims of Niton and its creditors and interest holders, and of gathering information about the operation and management of Niton's business before the Cayman Liquidation, and are engaged in discussions with creditors and interest holders. Wright Declaration, ¶¶ 55-61.

102.    So too, Niton's liquid assets and its books and records are located in the Cayman Islands, and its significant intangible rights in the form of potential claims will be controlled and coordinated by the Liquidators from the Cayman Islands. Wright Declaration, ¶ 51. The debts and credits that will result from these actions will be paid to and from the Liquidators in the Cayman

Islands. Wright Declaration, ¶ 59. The Liquidators also have met with the liquidation committee in the Cayman Islands. Wright Declaration, ¶ 61.

103.    Under the circumstances, the Liquidators submit that there is ample evidence and precedent to support recognition of the Cayman Liquidation as a foreign main proceeding.

### C.    Alternatively, the Cayman Liquidation Should Be Recognized as Foreign Non-Main Proceeding

104.    Section 1502(5) of the Bankruptcy Code defines a foreign nonmain proceeding as "a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment."  In turn, "establishment" is defined by 11 U.S.C. § 1502(2) as being "any place of operations where the debtor carries out nontransitory economic activity."

105.    The Liquidators respectfully submit that at a minimum, their activities in the Cayman Islands constitute nontransitory economic activity.  Wright Declaration, ¶ 49.  The Liquidators are continuing the remaining business of Niton as part of the winding-up of Niton's affairs from the Liquidators' offices in the Cayman Islands.  Wright Declaration, ¶ 52.  There is no foreign or domestic insolvency proceeding other than the Cayman Liquidation.

106.    As such, there can be no dispute that the Cayman Liquidation is a legitimate insolvency proceeding.  Under the circumstances, and given that Niton's ongoing business activities are being conducted from the Cayman Islands, at a minimum this Court can recognize the Cayman Liquidation as a foreign nonmain proceeding pursuant to chapter 15 and further, to grant the Liquidators the discretionary relief requested.

### D.    The Cayman Liquidation Meets All Other Requirements for Recognition

107.    In addition to being a foreign main (or nonmain) proceeding brought by a duly appointed foreign representative, the Cayman Liquidation meets all other requirements for

recognition under section 1515 of the Bankruptcy Code.  The Petition is accompanied by a certified copy of the Cayman Liquidation Order issued by the Cayman Court, which evidences the commencement of the Cayman Liquidation and the appointment of the Liquidators as joint official liquidators of Niton.  The Petition also is accompanied by a declaration that contains a statement identifying all foreign proceedings with respect to Niton that are known to the Liquidators.  *See* 11 U.S.C. §§ 1515(b),(c); *see also* Wright Declaration, ¶ 63.

108.    The Petition likewise is accompanied by a declaration containing the information required by Bankruptcy Rule 1007, including the disclosures required by Bankruptcy Rule 7007.1, a statement indicating that there are no other persons or entities known to the Liquidators that are authorized to administer foreign proceedings with respect to Niton, and a list of all parties to litigation with Niton in the United States.  *See* Wright Declaration ¶ 64, Exhibit C.  All documents supporting the Petition are in English.  *See* 11 U.S.C. § 1515(d).

109.    For all of these reasons, this Court can and should find that all of the requirements for recognition of the Cayman Liquidation as a foreign main proceeding under chapter 15 have been satisfied.

## II.    **DISCOVERY RELIEF IS WARRANTED HERE**

110.    Section 1521(a) provides that "[u]pon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief including . . . (4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities[.]"

111.    This District has recognized the broad scope of section 1521(a)(4).    *See In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 471 B.R. 342, 346 (Bankr. S.D.N.Y. 2012) (citation and footnote omitted) ("Section 1521(a)(4) provides specifically that the Court may enter an order providing for 'the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities.' ... By its terms, this provision enables a Foreign Representative to take broad discovery concerning the property and affairs of a debtor.").

112.    Similarly, this Court has discretion to order the disclosure of books, records, papers, electronic correspondence, banking and other information relating to Niton, its assets or financial affairs located in this District or that is within the possession, custody, or control of parties subject to the jurisdiction of this Court.    *See, e.g.,* 11 U.S.C. §§ 1519(a)(2), (3), 1521 (a)(5),(7); *see also In re Gee*, 53 B.R. 891, 905 (Bankr. S.D.N.Y. 1985) (under former section 304, the Court issued order "directing all persons and entities within the Southern District of New York which now have or may hereinafter obtain books and records, to forthwith turn over all such books and records to [Cayman Island Liquidator]"); *see also In re 47-49 Charles Street, Inc.*, No. 93 B 42821(CB) (S.D.N.Y. Mar. 30, 1999) ("Title 11, section 521(4) of the Bankruptcy Code clearly requires the Debtor to surrender its books and records to the trustee, and title 11, section 542(e) extends that requirement to attorneys, accountants and other persons who may hold such books and records.").

113.    Any third party who can be shown to have a relationship with a debtor can be made subject to investigation by a bankruptcy examiner since the purpose of such an investigation is to aid in discovery of assets.    *See In re Ionosphere Clubs, Inc.,* 156 B.R. 414, 432 (S.D.N.Y. 1993) (citing, e.g., *In re Vantage Petroleum Corp,* 34 B.R. 650, 651 (Bankr. E.D.N.Y. 1983); *Sachs v. Hadden,* 173 F.2d 929, 931 (2d. Cir. 1949)), *aff'd*, 17 F.3d 600, 607 (2d Cir. 1994), for the proposition that "[t]he investigation of an examiner in bankruptcy, unlike civil discovery under Rule 26(c), is supposed to be

a 'fishing expedition,' as exploratory and groping as appears proper to the Examiner. Because the purpose of the Rule 2004 investigation is to aid in the discovery of assets, any third party who can be shown to have a relationship with the debtor can be made subject to a Rule 2004 investigation." This Court routinely orders similar relief in cases under chapter 15. *See, e.g.*, *In re Millennium Globe Corp.*, 471 B.R. 342, 346-47 (Bankr. S.D.N.Y. 2012) (noting that "there is no authority in chapter 15 limit the discovery available to foreign representatives"); *In re Toft*, 453 B.R. 186, 193 (Bankr. S.D.N.Y. 2011) (noting that the foreign representative could take discovery under 15 U.S.C. § 1521(a)(4) even though the debtor had no assets or business in the United States, as this provision is "more explicit" in granting discovery requests than its predecessor statute 11 U.S.C. § 304); *In re Cozumel Caribe, S.A. de C.V.*, No. 10-13913 (MG) (Bankr. S.D.N.Y. Oct. 20, 2010) (granting foreign representative and "any other person properly appointed by the Mexican court" discovery rights under 11 U.S.C. § 1521(a)(4)).

114.   Indeed, and as previously noted in the introduction to this Petition, the precise relief sought by the Liquidators in this case, intermediary bank discovery in respect of a debtors' assets, affairs, rights, obligations, or liabilities, has been routinely granted by this Court. *See In re Lawndale Group S.A.*, No. 15-11352 (SCC) (Bankr. S.D.N.Y. July 6, 2015) (granting 1521(a)(4) request to engage in intermediary bank discovery regarding claims); *In re Pioneer Freight Futures Co. Ltd.*, No. 13-12324 (Bankr. S.D.N.Y. Aug. 23, 2013) (granting similar intermediary bank discovery relief); *In re Farenco Shipping Co. Ltd.*, 11-14138 (REG) (Bankr. S.D.N.Y. Sept. 7, 2011) (granting, *inter alia*, intermediary bank discovery relief sought); *In re Transfield ER Cape Ltd. (BVI)*, No. 10-16270 (MG) (Bankr. S.D.N.Y. Jan. 13, 2011) (intermediary bank discovery in respect of third party claims sought and obtained without objection on notice to Court); *In re Saad Invs. Fin. Co. (No. 5) Ltd.*, No.

09-13985 (KG) (Bankr. D. Del. August 14, 2014) (granting intermediary bank discovery relief upon application).

115.    It should also be noted that perhaps because of the obvious relevance of such information to foreign liquidation proceedings, no bank has objected to the resultant subpoenas issued.[9] Moreover, binding authority provides these are the banks' records and the banks' records alone. *AQ Asset Management v. Levine,* 974 N.Y.S.2d 332, 342 (1st Dep't 2013) (financial records are the banks' records; customers have no standing to object to subpoenas for financial records).

116.    Discovery and turnover of information concerning Niton's assets, affairs, rights, obligations or liabilities from the Discovery Subjects is precisely what the Liquidators seek here, and is essential to the Liquidators' efforts to fully investigate its Commercial Management Agreement Claims, its Insider Loan Claims and its Duty Claims so as to  eventually recover Niton's assets. Under the circumstances, the Liquidators respectfully request that upon recognition, this Court enter an Order:

    a.    issuing discovery requests to intermediary or correspondent banks located in the District that process U.S. dollar-denominated wire transfers and maintain records of such transfers with respect to the Discovery Subjects, to wit, Niton, its direct and indirect subsidiaries, DTA, the DTA Offshore Companies, the Medium Term Fund, CAPL and their respective SPVs, so as to ascertain information concerning Niton's assets prior to the commencement of the Cayman Liquidation and critical information concerning Niton's claims against third parties;

    b.    entry of an order that, upon service by Petitioners through their U.S. counsel, Holland & Knight, LLP, enjoins all persons and entities subject to the jurisdiction of this Court from destroying, secreting, altering, deleting or otherwise disposing of any documents, records, filings, or other information, however stored, concerning or relating to the affairs of Niton; and

    c.    granting the Petitioners authority to assert claims of Niton against parties that are subject to jurisdiction in the United States

---

[9] The basis for this statement undersigned has been involved in all but one of the above stated cases.

## REQUEST FOR WAIVER OF LOCAL BANKRUPTCY RULE 9013-1(a)

117.    It is respectfully requested that this Court waive and dispense with the requirement set forth in Rule 9013-l(a) of the Local Rules for the United States Bankruptcy Court for the Southern District of New York that any motion filed shall be accompanied by a memorandum of law on the grounds that the relevant authorities in support of the Petition are contained herein.

## HEARING DATES AND NOTICES

118.    Section 1517(c) of the Bankruptcy Code requires that "[A] petition for recognition of a foreign proceeding shall be decided upon at the earliest possible time." Bankruptcy Rule 2002 sets forth a twenty-one day notice requirement to parties in interest with certain exceptions to approve the Petition. If no objections to this Petition are filed by the date ordered for such objections, the Liquidators request that the Court enter the proposed order recognizing the Cayman Liquidation as a foreign main proceeding without a hearing pursuant to Local Rule 2002-2, however the Liquidators and their counsel are of course happy to appear and will prepared to answer any questions that the Court may have.

119.    Subsection (q)(1) of Rule 2002 governs notice of a petition for recognition of a foreign proceeding. As per the rule, and as per the practice in similar cases where neither provisional relief is sought nor is there pending United States litigation, Liquidators propose that once a hearing date has been set by the Court, notice will be given as reasonable and appropriate under the circumstances and pursuant to Rule 2002.

120.    No previous application for the relief requested in this Petition has been made in this or any other court in the United States.

## CONCLUSION

WHEREFORE, the Liquidators respectfully request that this Court enter an Order, substantially in the form of Exhibit A to this Petition, granting the relief requested herein and such other and further relief as may be just and proper.

Dated: New York, New York
December 7, 2015

Respectfully submitted,

HOLLAND & KNIGHT LLP

By: _____

Warren E. Gluck, Esq.
Barbra R. Parlin, Esq.
31 West 52nd Street
New York, NY 10019
Telephone: 212-513-3200
Telefax: 212-385-9010
Email: warren.gluck@hklaw.com
          barbra.parlin@hklaw.com

*Counsel for the Liquidators of Niton Fund SPC*